[Cite as *Woeste v. Woeste*, 2022-Ohio-2825.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| SUZANNA WOESTE nka BACHMAN, | : | CASE NO. CA2021-09-055 |
| Appellee, | : | O P I N I O N<br>8/15/2022 |
| | : | |
| - vs - | : | |
| | : | |
| MICHAEL A. WOESTE, | : | |
| Appellant. | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2019DRA00052

Michael A. Kennedy, for appellee.

Engel & Martin, LLC, and Jim L. Hardin, for appellant.

**M. POWELL, P.J.**

{¶ 1} Appellant, Michael A. Woeste, appeals a decision of the Clermont County Court of Common Pleas, Domestic Relations Division, designating appellee, Suzanna Woeste nka Bachman, residential parent and legal custodian of the parties' minor daughter, and ordering a division of the parties' marital and separate property in their divorce action.

{¶ 2} The parties were married on October 25, 2003. Two sons, Ruppert and Ian,

and a daughter, Vivian, were born issue of their marriage.[1]  On January 10, 2019, Suzanna filed a complaint for divorce.  Ruppert was almost 15 years old; Ian was almost 11 years old; Vivian was six and one-half years old.  A guardian ad litem ("GAL") was appointed for the children.

**{¶ 3}**  The parties owned two residences, the marital home located on Baas Road in Batavia, Ohio, and a residence located on Madison Street in Glouster, Ohio (the "Madison Street Property").  On January 29, 2019, Michael was granted exclusive occupancy of the marital home.  The outstanding mortgage balance was then $119,831.66.  Pursuant to an agreed entry filed on July 19, 2019, the marital home was to be sold.  The agreed entry further stated, "Effective February 1, 2019, [Michael] shall pay the mortgage, taxes and insurance on said property."  The marital home sold for $196,000 in July 2019.  The net proceeds were deposited into an escrow account.

**{¶ 4}**  On November 13, 2019, the parties filed stipulations.  Pursuant to the stipulations, the duration of the marriage was from October 25, 2003, to February 1, 2019.  The stipulations indicated that the marital home had been sold, that the net proceeds had been deposited into an escrow account with Michael's counsel as trustee, and that the escrowed sale proceeds would be disbursed as agreed by the parties or ordered by the trial court.  The stipulations ordered the parties to sell the Madison Street Property, stating

> At closing on sale of the [Madison Street Property] and following payment of all expenses incident to sale, including but not limited to, the first note and mortgage to Ohio University Credit Union in the approximate amount of $2,500.00, real estate taxes, * * * the net proceeds shall be equally divided between the parties.  To the extent that [Michael] has paid taxes on this property, he shall be credited with half of the amount so paid.

In addition to the $2,500 note owed to Ohio University Credit Union, the stipulations further

---

1. For privacy and readability, we refer to the children using fictitious names.

indicated that the parties owed $2,000 in delinquent taxes for the Madison Street Property.

{¶ 5} Finally, as pertinent here, the stipulations provided,

> [Michael] shall receive, free and clear of any interest on behalf of [Suzanna], all right, title, and interest in the businesses known as "Permaculture Guru" and "Phoenix Farm Ohio LLC." [Michael] shall receive all assets and be responsible for all liabilities associated with said businesses. [Michael] shall retain all equity contained therein, including full ownership of all shares of stock, distribution of income and earnings, accounts, equity, equipment, and furnishings.

{¶ 6} On April 8, 2020, both parties filed proposed shared parenting plans. By then, Michael's relationship with his sons was strained: Ruppert was refusing all parenting time with Michael; parenting time with Ian only occurred during reunification therapy sessions. By contrast, the parties were following the parenting time schedule established by agreed entry in October 2019 regarding Vivian, to wit, Michael was exercising weekly parenting time from 3:00 p.m. on Wednesday until 8:00 a.m. on Friday, and on alternating weekends. However, following his parenting time with Vivian on Father's Day on June 21, 2020, Michael kept Vivian and filed an emergency motion for change of custody, alleging "abuse, neglect and lack of adequate supervision." Michael refused to return Vivian to Suzanna "until a decision [was] made." Suzanna filed a contempt motion against Michael. The magistrate found Michael in contempt on August 4, 2020. Vivian was returned to Suzanna. Vivian was therefore withheld from her mother from June 21, 2020, until August 4, 2020, or six weeks.

{¶ 7} The trial court held a hearing on the divorce complaint on October 13-14, 2020. By judgment entry filed on January 8, 2021, the trial court granted the parties a divorce, adopted the parties' stipulations "as additional findings and orders," designated Suzanna as the residential parent and legal custodian of the children and granted standard parenting time to Michael, and divided the parties' property and debts.

{¶ 8} A judgment entry and decree of divorce was journalized on March 4, 2021. As pertinent here, it disbursed the escrowed sale proceeds of the marital home as follows:

> [T]he balance to be divided on the first day of trial was $38,655.93. The Court ordered that $2,811.25 be paid to the GAL; as a result the amount to be divided is $35,844.68. Although it would be expected that the amount would be divided equally between the parties, the Court will order the following offsets:
>
> From Michael's half of the escrowed amount Suzanna is entitled to $2,204.15 for mortgage payments not made by Michael, although he was ordered to do so; and
>
> The amount of $351.36 and $2,711.77 for Michael's failure to divide his bank accounts.
>
> Additionally, there is a lien on Michael's share of the escrow funds from his last attorney, journalized in the Court on July 29, 2020, which will also be paid from his share, if adequate funds are available after offsets to Suzanna are paid. The Court specifically rejects Michael's arguments that Suzanna should be responsible for the entirety of the GAL fees, because the GAL was somehow prejudiced against him.

{¶ 9} Michael now appeals, raising two assignments of error.

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT ERRED IN THE DETERMINATION OF PROPERTY DISTRIBUTION INCLUDING ASSETS AND LIABILITIES BETWEEN THE PARTIES TO THE PREJUDICE OF APPELLANT.

{¶ 12} Michael challenges the trial court's division of the parties' marital and separate property, presenting five issues for review.

{¶ 13} In divorce proceedings, R.C. 3105.171(B) requires a trial court to "determine what constitutes marital property and what constitutes separate property. In either case, upon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section." Upon classifying property as marital or separate, the trial court has broad discretion in arriving at an equitable and fair

property division. *Bauer v. Bauer*, 12th Dist. Warren Nos. CA2019-04-033 and CA2019-04-040, 2020-Ohio-425, ¶ 22. An appellate court will not reverse a trial court's property division in a divorce proceeding absent an abuse of discretion. *Id.* An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 14} Separate property is not marital property. R.C. 3105.171(A)(3)(b). Marital property includes

> (ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
>
> (iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage.

R.C. 3105.171(A)(3)(b)(ii),(iii).

{¶ 15} Separate property includes

> (ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
>
> (iii) Passive income and appreciation acquired from separate property by one spouse during the marriage[.]

R.C. 3105.171(A)(6)(a)(ii),(iii). "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of evidence, to trace the asset to separate property. *Bauer*, 2020-Ohio-425 at ¶ 24.

**Allocation of the Marital Home Escrowed Sale Proceeds**

{¶ 16} Michael was granted exclusive occupancy of the marital home on January 29, 2019. The outstanding mortgage balance was then $119,831.66. By all accounts, the marital home needed remodeling and repairs to make it habitable. Michael testified that the value of the marital home was "significantly below" the outstanding mortgage balance on January 31, 2019, that he "invested thousands of dollars and a significant amount of my time and time of others" in completing the remodeling and repairs, and that Suzanna contributed nothing. Michael further testified that because of the remodeling and repairs he made, the marital home passed building and plumbing inspections, he obtained a certificate of occupancy, and the value of the home greatly increased, ultimately selling for $196,000.

{¶ 17} In his first issue for review, Michael argues that the trial court abused its discretion in awarding Suzanna one-half of the marital home sale proceeds and in deducting $2,204.15 from his share of the escrowed sale proceeds for mortgage payments he did not make. Based upon his testimony concerning the value of the marital home, the owner-opinion rule, and our opinion in *Kohus v. Kohus*, 12th Dist. Clermont No. CA2002-07-055, 2003-Ohio-2551, Michael asserts that he should have received 100 percent of the sale proceeds.

{¶ 18} Ordinarily, testimony as to property value is not competent and admissible unless it is the professional opinion of an expert. *Worthington City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 140 Ohio St.3d 248, 2014-Ohio-3620, ¶ 18. However, "Ohio law has long recognized that an owner of either real or personal property is, by virtue of such ownership, competent to testify as to the market value of the property." *Smith v. Padgett*, 32 Ohio St.3d 344, 347 (1987).

{¶ 19} Thus, the owner-opinion rule allows the property owner to testify primarily as a fact witness about the value of his or her own property without being qualified as an expert because he or she is presumed to be familiar with it from having purchased or dealt with it.

*Worthington City Schools* at ¶ 18-19. However, the owner-opinion rule deals solely with a property owner's competency to testify about his or her opinion of value; the rule relates to the admissibility of the owner's testimony, not its weight. *Id.* at ¶ 19; *Remington Clean Fill L.L.C. v. Milford Exempted Village Schools Bd. of Edn.*, 12th Dist. Clermont No. CA2020-12-074, 2021-Ohio-3779, ¶ 35. "[T]here is no requirement that the finder of fact accept [the owner's value] as the true value of the property." *WJJK Investments, Inc. v. Licking Cty. Bd. of Revision*, 76 Ohio St.3d 29, 32, 1996-Ohio-437; *Redding v. Cantrell*, 12th Dist. Madison Nos. CA2020-11-020 and CA2020-11-021, 2022-Ohio-567, ¶ 29.

{¶ 20} Unlike the property owner in *Kohus*, Michael did not provide a dollar figure or express an opinion as to the value of the marital home when he was granted exclusive occupancy but simply testified it was "significantly below" the outstanding mortgage balance. Likewise, Michael did not express an opinion as to the increase in value due to his efforts and expenses in rehabbing the marital home. No appraisal or other expert testimony was presented regarding the value of the marital home or the appreciation in its value due to Michael's efforts. Michael testified he "invested thousands of dollars and a significant amount of my time and time of others" in completing the remodeling and repairs but provided no evidence to support his testimony. The only evidence presented by Michael in support of his testimony consisted of photographs depicting the unhabitable and cluttered condition of the marital home before he rehabbed it and a photograph showing the certificate of occupancy, a plumbing inspection tag, and a $140 receipt from the Clermont County Building Inspection office.

{¶ 21} Although Michael was permitted to testify about the value of the marital home under the opinion-owner rule, the trial court was free to give whatever weight it wanted to Michael's testimony and was not required to accept it. *Redding*, 2022-Ohio-567 at ¶ 31. Considering the foregoing, the trial court did not abuse its discretion in rejecting Michael's

testimony regarding the value of the marital home when he was granted exclusive occupancy of the home and the appreciation in its value due to Michael's efforts and expenses in rehabbing the home. Furthermore, the trial court did not abuse its discretion in awarding Suzanna one-half of the marital home sale proceeds.

{¶ 22} We also find that the trial court did not abuse its discretion in deducting $2,204.15 from Michael's share of the escrowed sale proceeds for mortgage payments he did not make. The July 19, 2019 agreed entry to sell the marital home, which was signed by both parties and their counsel, specifically stated, "Effective February 1, 2019, [Michael] shall pay the mortgage, taxes and insurance on said property." Suzanna's Exhibit 12, the marital home's mortgage history after Michael was granted exclusive occupancy of the home, was admitted into evidence and shows unpaid mortgage payments. Michael did not challenge Exhibit 12 or present evidence he had made the mortgage payments. Michael's failure to make the mortgage payments reduced the amount of the net sale proceeds.

{¶ 23} We also note Michael argues the trial court erred in awarding Suzanna $5,000 from the escrowed sale proceeds because she is not entitled to it. However, the July 19, 2019 agreed entry specifically stated, "Distribution of the funds held by [Michael's counsel] as Trustee shall be by agreement or Court order. As of August 1, 2019 the parties agree each shall receive $5,000.00 from the escrow held by [Michael's counsel]."

{¶ 24} We find no merit to Michael's first issue for review.

**The Madison Street Property**

{¶ 25} There was a $2,500 note and mortgage to Ohio University Credit Union on the Madison Street Property and the parties owed an additional $2,000 in delinquent taxes on the property. Paragraph 3.1 of the parties' stipulations dealt with the property and stated, in pertinent part, that at closing and following payment of the $2,500 note and real estate taxes, "the net proceeds shall be equally divided between the parties. To the extent that

[Michael] has paid taxes on this property, he shall be credited with half of the amount so paid." The Madison Street Property was eventually sold.

{¶ 26} In his second issue for review, Michael claims that he "settled" the $2,500 note to Ohio University Credit Union and the $2,000 in delinquent real estate taxes prior to the October 2020 final divorce hearing, and thus, the trial court abused its discretion in failing to award him $1,250 and $1,000 for those payments, respectively.

{¶ 27} There was no testimony regarding the Madison Street Property during the divorce hearing. Michael did not submit the closing statement for the sale of the Madison Street Property at the hearing or any other documentation that he paid the $2,500 note and the $2,000 delinquent taxes prior to the closing of the sale of the Madison Street Property. He therefore failed to prove he made those payments. Thus, the trial court did not abuse its discretion in failing to award Michael one-half of the outstanding note and one-half of the delinquent taxes.

### Michael's Retirement Account

{¶ 28} Michael owns a Federal Thrift Savings Plan ("TSP") retirement account. As of December 31, 2018, the balance of the account was $62,137.87. Michael testified he owned the TSP account before he married Suzanna and that he contributed approximately $6,000 to the account prior to the marriage. In support of his claim, Michael submitted Exhibit U, the 2018 annual statement for the account. Finding "little to no substantiation of [the] claim", the trial court found that the TSP account was marital property subject to an equal division between the parties.

{¶ 29} In his third issue for review, Michael argues that his $6,000 premarital contribution to the TSP account is his separate property and thus, the trial court abused its discretion in failing to award him the $6,000 contribution as his separate property. As he did below, Michael cites Exhibit U in support of his claim.

{¶ 30} Exhibit U consists of six pages. The first page is not numbered but the next three pages are numbered consecutively as two through four. All four pages include Michael's name and the account number. The sixth page is not numbered and is a duplicate of the first page. Michael relies upon the fifth page in claiming that $6,004.19 is his separate property. Unlike the first four pages of Exhibit U, the fifth page does not include the account number, includes instead Michael's social security number, and cannot be identified as relating to the TSP account. Furthermore, the fifth page is noticeably darker than the other pages, has a different font and layout, and is identified as "Page 2 of 2." We note that Suzanna submitted Exhibit 15 as the 2018 annual statement of the TSP account. Exhibit 15 consists of only four pages which are identical to the first four pages of Exhibit U.

{¶ 31} The trial court admitted Exhibit U "with the exception of page 5." "It is wholly within the trial court's discretion to weigh the testimony, documentation, and credibility of witnesses." *J.R. v. K.R.*, 8th Dist. Cuyahoga No. 106978, 2019-Ohio-1765, ¶ 27. "A trial judge has wide discretion when determining the admissibility of such evidence, and will not be disturbed on appeal absent a clear showing of an abuse of discretion*." Id.* Michael does not challenge the trial court's exclusion of page 5 of Exhibit U and we find no abuse of discretion in its exclusion from evidence. As stated above, the party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of evidence, to trace the asset to separate property. *Bauer*, 2020-Ohio-425 at ¶ 24. Michael's mere conclusory testimony that he contributed approximately $6,000 to the TSP account prior to the marriage fails to meet his burden of proof.

{¶ 32} The trial court therefore did not abuse its discretion in finding that the TSP account was marital property and dividing it equally between the parties.

**Michael's PNC Bank Accounts**

{¶ 33} Michael had two PNC bank accounts, a business account ending in #1517

with a balance of $702.72 for his business known as Permaculture Guru, LLC, and a personal account ending in #1936 with a balance of $5,423.50. The trial court ordered that the balance of these accounts be divided equally between the parties and deducted the sums of $351.36 and $2,711.77 from Michael's share of the escrowed sale proceeds of the marital home to provide Suzanna with her one-half distribution from these accounts.

{¶ 34} In his fourth issue for review, Michael argues that the trial court's division of his PNC business account is contrary to the parties' stipulations. Michael further argues the trial court abused its discretion in awarding Suzanna one-half of his PNC personal bank account because Suzanna failed to disclose her bank accounts.

{¶ 35} It is undisputed that Michael is the sole proprietor of Permaculture Guru, LLC. Paragraph 11 of the parties' stipulations specifically provides that

> [Michael] shall receive, free and clear of any interest on behalf of [Suzanna], all right, title, and interest in the businesses known as "Permaculture Guru" and "Phoenix Farm Ohio LLC." [Michael] shall receive all assets and be responsible for all liabilities associated with said businesses. *[Michael] shall retain all equity contained therein, including full ownership of all shares of stock, distribution of income and earnings, accounts*, equity, equipment, and furnishings.

(Emphasis added.)

{¶ 36} Paragraph 19 of the trial court's judgment entry and divorce decree states, "IT IS FURTHER ORDERED that [Michael] shall receive free and clear of any interest on behalf of [Suzanna], all right, title, and interest in the businesses known as "Permaculture Guru" and "Phoenix Farm Ohio LLC," and incorporates Paragraph 11 of the stipulations above verbatim. Given the clear stipulation, the trial court erred in awarding Suzanna one-half of Michael's PNC business account, or $351.36.

{¶ 37} Michael's argument that Suzanna failed to disclose her bank accounts is, however, not supported by the record. While Suzanna did not submit her bank accounts

as exhibits, she filed an affidavit of property with the trial court along with her divorce complaint. The affidavit lists one PNC bank account in her name, two bank accounts in Michael's name, and two joint bank accounts, and includes the balance in all the accounts. The trial court did not abuse its discretion in awarding Suzanna one-half of Michael's PNC personal bank account, or $2,711.77.

**Michael's Prior Counsel's Charging Lien**

{¶ 38} On June 29, 2020, Randy Blankenship, Michael's then trial counsel, moved to withdraw as counsel on grounds including Michael's failure and refusal to pay Blankenship's attorney fees. On July 29, 2020, the magistrate issued an order granting Blankenship's motion to withdraw. The magistrate's order reflects that the matter came before the magistrate on July 27, 2020. The order further provided,

> The funds being held in escrow by Blankenship Massey & Associates, PLLC shall be transferred to the escrow account of [Suzanna's] counsel, John Daggett. Randy J. Blankenship and Blankenship Massey & Associates, PLLC shall preserve any lien on [Michael's] portion of said funds to secure payment of fees and costs in this matter and said transfer shall not prejudice any such claim to a lien against the escrowed funds.

{¶ 39} In disbursing the escrowed sale proceeds of the marital home, the judgment entry and decree of divorce provided, "[T]here is a lien on Michael's share of the escrow funds from his last attorney, journalized in the Court on July 29, 2020, which will also be paid from his share, if adequate funds are available after offsets to Suzanna are paid."

{¶ 40} In his fifth issue for review, Michael argues the trial court abused its discretion in subjecting his share of the escrowed sale proceeds to a lien for his prior counsel's attorney fees. Michael asserts that the trial court and Blankenship failed to follow recognized procedures and that as a result, he was unable to present witnesses or contest the merits of the amounts claimed. Michael cites *Galloway v. Galloway*, 8th Dist. Cuyahoga No. 103837, 2017-Ohio-87, in support of his argument.

{¶ 41} A charging lien is "[a]n attorney's lien on a claim that the attorney has helped the client perfect, as through a judgment or settlement." *Black's Law Dictionary* 1108 (11th Ed.2019). In a recent opinion, the Ohio Supreme Court noted, "What was true in 1908 is true today: Ohio—unlike a majority of states—has no statute addressing how and when an attorney's charging lien attaches or how it can be enforced. Instead, in Ohio, charging liens are recognized and enforced under the common law." *Kisling, Nestico & Redick, L.L.C. v. Progressive Max Ins. Co.*, 158 Ohio St.3d 376, 2020-Ohio-82, ¶ 9.

{¶ 42} The supreme court "has long recognized the viability of charging liens, the philosophical underpinning of which is that an attorney who has not been paid for his or her legal services is entitled to receive payment for those services from a judgment or fund that was created through his or her efforts[.]" *Id.* at ¶ 10. *See also Diehl v. Friester*, 37 Ohio St. 473 (1882); *Cohen v. Goldberger*, 109 Ohio St. 22 (1923). The enforcement of a charging lien is an equitable remedy. *Kisling* at ¶ 11. "Generally, four elements must be present for a charging lien to be enforceable: (1) 'a valid express or implied contract between the attorney and the client,' (2) 'a fund recovered by the attorney,' (3) 'notice of intent to assert a lien,' and (4) 'a timely assertion of the lien.'" *Id.* at ¶ 12. The second element "is a recognition that the enforcement of a charging lien is an equitable remedy." *Id.*

{¶ 43} "Ordinarily, the enforceability of a charging lien is dependent on the power of the court in which the fund was created." *Kisling*, 2020-Ohio-82 at ¶ 15. "[U]ntil a judgment is fully executed, the court retains jurisdiction of the subject matter and the parties for the purpose of hearing any motion affecting such judgment, and if the attorney desires to have his lien established and declared against such judgment, he may apply to the court for that purpose." *Id.* "An attorney's lien is enforceable through the control the courts have of their judgments and records, and by means of their own process." *Id. See also Galloway*, 2017-Ohio-87 at ¶ 9; *Fire Protection Resources, Inc. v. Johnson Fire Protection Co.*, 72 Ohio

App.3d 205, 209 (6th Dist.1991). "[T]he compensation of the attorneys 'should be worked out by application to the court holding the fund, and in which the services were rendered.'" *Kisling* at ¶ 15, quoting *Olds v. Tucker*, 35 Ohio St. 581, 584 (1880). "The fact that an attorney has been discharged from a case does not mean that a charging lien cannot be enforced. Ohio courts have recognized that a party's former attorney may pursue a charging lien by intervening in an action or by filing a motion." *Kisling* at ¶ 16.

{¶ 44} Michael cites *Galloway* for the proposition that courts should consider the following factors when determining whether to exercise their authority to enforce a charging lien:

> (1) the right of the client to be heard on the merits; (2) the right of an attorney to invoke the equitable jurisdiction of the courts to protect his fee for services rendered; (3) the elimination of unnecessary and duplicative litigation; (4) the opportunity for the client to obtain counsel to litigate the claim for attorney fees; (5) the propriety of an order as opposed to a judgment; (6) a forum for the presentation of witnesses, if necessary; and (7) the equitable nature of the proceeding.

*Galloway* at ¶ 11, quoting *Fire Protection Resources, Inc.* at 210-211. Michael asserts that the trial court was required but failed to consider the foregoing factors in its consideration of Blankenship's charging lien; as a result, he was unable to present witnesses or contest the merits of the amounts claimed.

{¶ 45} As stated above, the matter came before the magistrate on July 27, 2020, following Blankenship's motion to withdraw as counsel on the ground Michael had refused to pay attorney fees. If a hearing was held on Blankenship's motion, Michael failed to file a transcript of the hearing from which the July 29, 2020 magistrate's order arose. In the event no recording of the proceedings was made, a transcript was unavailable, or a recording was made but is no longer available for transcription, Michael could have filed an App.R. 9(C) statement of the evidence. Michael did not file an App.R. 9(C) statement of the evidence.

Thus, we have no record of what may have occurred that resulted in the magistrate's order providing that Blankenship had a lien on Michael's share of the marital home escrowed sale proceeds. We cannot determine whether Blankenship requested such a lien, and if so, whether Michael objected or assented to the same.

{¶ 46} Furthermore, Civ.R. 53(D)(2)(b) provides in relevant part that "any party may file a motion with the court to set aside a magistrate's order. The motion shall state the moving party's reasons with particularity and shall be filed not later than ten days after the magistrate's order is filed." *See Spier v. Spier*, 7th Dist. Mahoning No. 05 MA 26, 2006-Ohio-1289 (a party unsatisfied with a magistrate's order may move to set the order aside). Ohio courts, including this court, have held that if a party does not move to set aside a magistrate's order, that party has waived a challenge to that order on appeal. *Ganaway v. Ganaway*, 12th Dist. Warren No. CA2016-05-039, 2017-Ohio-1009, ¶ 17. Here, Michael did not move to set aside the magistrate's July 29, 2020 order as required under Civ.R. 53(D)(2)(b).

{¶ 47} Given the lack of a record as to what occurred before the magistrate on July 27, 2020, and Michael's failure to file a motion to set aside the magistrate's July 29, 2020 order, we are unable to review the trial court's compliance with the factors set forth in *Galloway* and *Fire Protection Resources, Inc.* Thus, we must presume the regularity of the proceedings below and affirm the trial court's decision subjecting Michael's share of the escrowed sale proceeds to Blankenship's charging lien. *See Mallikarjunaiah v. Shankar*, 12th Dist. Warren Nos. CA2019-11-122 and CA2019-11-123, 2020-Ohio-4508.

{¶ 48} To the extent the trial court erred in awarding $351.36 to Suzanne from Michael's PNC business account, Michael's first assignment of error is sustained in part. As to all other issues, the first assignment of error is overruled.

{¶ 49} Assignment of Error No. 2:

{¶ 50} THE TRIAL COURT ERRED IN THE DETERMINATION THAT APPELLEE SHOULD BE THE DESIGNATED RESIDENTIAL PARENT/LEGAL CUSTODIAN OF THE PARTIES' MINOR CHILD, VIVIAN.

{¶ 51} Michael argues the trial court erred when it did not order shared parenting and instead designated Suzanna the residential parent and legal custodian of Vivian.[2] Specifically, Michael argues the trial court failed to make findings of fact and conclusions of law to support its rejection of the parties' shared parenting plans as required by R.C. 3109.04(D)(1)(a)(ii). Michael further argues the trial court erred in designating Suzanna the residential parent and legal custodian of Vivian because the factors set forth in R.C. 3109.04(F) favor shared parenting of Vivian.

{¶ 52} The parties each filed a proposed shared parenting plan in April 2020. During the October 2020 divorce hearing, Suzanna testified she wanted to be named the residential parent and legal custodian of the children and that shared parenting was now simply a second option. By contrast, Michael testified he was seeking shared parenting. However, should the trial court decline to order shared parenting, he wanted to be named the residential parent and legal custodian of Vivian.

{¶ 53} A trial court has broad discretion in allocating parental rights and responsibilities and its decision will not be reversed absent an abuse of discretion. *Seng v. Seng*, 12th Dist. Clermont No. CA2007-12-120, 2008-Ohio-6758, ¶ 16. "The discretion a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination has on the lives of the parties concerned." *Grover v. Dourson*, 12th Dist. Preble No. CA2018-07-007, 2019-Ohio-

---

2. As stated above, the trial court designated Suzanna the residential parent and legal custodian of the parties' three children, not just Vivian. However, Michael's second assignment of error only challenges the trial court's allocation of parental rights and responsibilities regarding Vivian.

2495, ¶ 15. So long as there is competent and credible evidence in the record to support the custody determination, the trial court's decision will stand because the court has had the best opportunity "to view the demeanor, attitude, and credibility of each witness," which may not easily translate to the written record. *Seng* at ¶ 16; *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997-Ohio-260.

{¶ 54} R.C. 3109.04 governs a trial court's allocation of parental rights and responsibilities. The court is further guided by the statute when it chooses to designate one parent as the residential parent and legal custodian of a child, or instead delegates those responsibilities to both parents under a shared parenting plan. *Seng* at ¶ 17. Of paramount concern in any custody determination is the requirement that the trial court's decision be made in the child's best interest. *Id.*

{¶ 55} To determine what is in the best interest of a child, R.C. 3109.04(F)(1) requires a court to consider all relevant factors. *Ackley v. Haney*, 12th Dist. Fayette No. CA2021-07-017, 2022-Ohio-2382, ¶ 15. Factors enumerated by the statute include, but are not limited to: (1) the wishes of the parents; (2) the child's interaction and interrelationship with her parents, siblings, and other persons who may significantly affect the child's best interest; (3) the child's adjustment to home, school, and community; (4) the mental and physical health of all persons involved; and (5) the likelihood that the caregiver would honor and facilitate visitation and parenting time. *Id.*

{¶ 56} "When determining whether shared parenting is in a child's best interest, the trial court must consider the additional factors set forth in R.C. 3109.04(F)(2)." *Chaney v. Chaney*, 12th Dist. Warren No. CA2021-09-087, 2022-Ohio-1442, ¶ 37. These factors are: (1) the ability of the parents to cooperate and make decisions jointly, with respect to the child; (2) the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; (3) any history or potential for abuse, other domestic

violence, or parental kidnapping by either parent; (4) the geographic proximity of the parents to one another; (5) and the recommendation of the guardian ad litem, if the child has a guardian ad litem. R.C. 3109.04(F)(2)(a) thru (e). "While no factor in R.C. 3109.04(F)(2) is dispositive, effective communication and cooperation between the parties is paramount in successful shared parenting." *Seng*, 2008-Ohio-6758 at ¶ 21.

{¶ 57} Michael argues the trial court failed to make findings of fact and conclusions of law to support its rejection of the parties' proposed shared parenting plans as required by R.C. 3109.04(D)(1)(a)(ii).

{¶ 58} R.C. 3109.04(D)(1)(a)(ii) sets forth the procedure a trial court must follow when both parties submit their own shared parenting plan. The approval or rejection of a shared parenting plan under R.C. 3109.04(D)(1)(a)(ii) is discretionary with the trial court, and the court will not approve a shared parenting plan unless it determines that the plan is in the best interest of the child. R.C. 3109.04(D)(1)(b); *Naegel v. Naegel*, 12th Dist. Clermont No. CA93-06-041, 1994 Ohio App. LEXIS 326, *9 (Jan. 31, 1994). However, whether the trial court approves a shared parenting plan or refuses to order shared parenting, R.C. 3109.04(D)(1)(a)(ii) requires the trial court to enter findings of fact and conclusions of law as to the reasons for approving or rejecting a shared parenting plan. "The requirement does not mean that the trial court must provide a detailed analysis. Instead, the court may substantially comply with the statute if the reasons for approval or denial of the shared parenting plan are apparent from the record." *Wolf-Sabatino v. Sabatino*, 10th Dist. Franklin No. 10AP-1161, 2011-Ohio-6819, ¶ 85.

{¶ 59} In its January 8, 2021 judgment entry, the trial court declined to order shared parenting because

> The court, upon review of the testimony of the parties and witnesses and the report and subsequent testimony of the GAL, does not find that this matter is even close to a case that would

be appropriate for shared parenting. Michael's hostility toward Suzanna and his unbending attitude toward children who are in a confusing and difficult time, illustrates his lack of understanding of the needs for adolescents. Michael's action of keeping Vivian from her mother for [an] extended period of time, because he viewed difficulties with "hygiene," etc. as a valid justification without seeking court intervention, makes it clear to the Court that he disrespects the court as well as the mother of his children. His view is that he alone can decide what is in [the] children's best interests.

The court grants sole custody and residential parent status to Suzanna.

{¶ 60} The trial court's rejection of the parties' shared parenting plans was preceded by the court's consideration and discussion of the R.C. 3109.04(F)(1) factors. As discussed below, there was competent, credible evidence to support the trial court's conclusion that shared parenting is not in Vivian's best interest, and the trial court's reasons for denying shared parenting are apparent from the record. Thus, the trial court substantially complied with R.C. 3109.04(D)(1)(a)(ii). *Naegel*, 1994 Ohio App. LEXIS 326 at *10. We find no merit to Michael's first issue for review.

{¶ 61} Michael further argues the trial court erred in designating Suzanna the residential parent and legal custodian of Vivian because the factors set forth in R.C. 3109.04(F) favor granting shared parenting of Vivian. In support of his argument, Michael emphasizes his close and loving relationship with Vivian, the parties' cooperation and ability to compromise regarding the children's education and health during the parties' marriage, the sons' poor school performance while under Suzanna's care, and the fact the GAL consistently ignored his concerns regarding Vivian and clearly acted in Suzanna's best interest, and not those of the children.

{¶ 62} In rejecting shared parenting and designating Suzanna the residential parent and legal custodian of Vivian, the trial court considered and discussed each of the ten R.C. 3109.04(F)(1) best-interest factors in light of the evidence presented at the divorce hearing.

The trial court did not refer to the R.C. 3109.04(F)(2) factors in determining whether shared parenting was in Vivian's best interest. However, much of the trial court's discussion of the R.C. 3109.04(F)(1) factors applies to the R.C. 3109.04(F)(2) factors. As stated above, the R.C. 3109.04(F)(2) factors include the parents' ability to cooperate and make joint decisions regarding the child, each parent's ability to encourage the sharing of love, affection, and contact between the child and the other parent, any history of parental kidnapping, the geographic proximity of the parents to each other, and the recommendations of the guardian ad litem. Testimony indicates that Suzanna lives in Goshen in Clermont County; Michael lives in Brown County. Throughout its discussion, the trial court referred to the GAL's reports and testimony.

**{¶ 63}** The GAL's investigation included meeting with the children, Suzanna, and Michael, a phone conference with the therapist then seeing the children and Suzanna, and discussion with a family friend. The GAL memorialized her observations and recommendations into two reports. Ultimately, she recommended that shared parenting was not appropriate in this case and that Suzanna should be granted sole legal and residential custody of the children.

**{¶ 64}** The GAL indicated that shared parenting was not a viable option due to the parties' opposing belief systems regarding medical treatment, the lack of trust between them, Michael's relentless criticism of Suzanna and his continued insistence she is an inadequate provider, and the parties' tendency to behave in spiteful ways at the expense of their children's well-being. The GAL stated that given the dysfunction in the parties' relationship and communication, shared parenting would result in continued conflict and contention and would be harmful to the children. The GAL recommended granting sole custody to Suzanna because she provides more emotional stability and healthier examples for the children who are much bonded to her and feel safer in her care.

{¶ 65} In her reports and during the divorce hearing, the GAL described specific concerns she had regarding shared parenting. Specifically, the GAL noted that Michael presents as a principled and hyper critical individual who believes Suzanna has alienated all three children against him, who blames and regularly disparages Suzanna, including in the presence of the GAL and the children, and who would benefit from engaging in individual therapy and developing more empathy for the children's needs. In particular, she cited an incident during which Michael photographed Vivian while she was bathing in an attempt to prove Suzanna had inflicted a bruise on Vivian. The GAL noted that Michael's "need to prove what he feels are [Suzanna's] shortcomings overwhelmed his ability to feel any empathy for his daughter on that occasion."

{¶ 66} The GAL further stated that though he may have believed his actions were warranted, Michael's withholding of Vivian from the custody of Suzanna for six weeks not only confused and emotionally damaged Vivian, it also hurt Michael's relationship with Vivian. The GAL underscored her statement by noting that after she was returned to Suzanna, Vivian was reticent to go back to Michael's house for his parenting time and in fact panicked and cried hysterically when Michael appeared at a physician office where Vivian had a medical appointment.

{¶ 67} The GAL testified that the children were unusually smart and that their academic struggles were most likely due to the divorce. The GAL stated that once the children can settle into a routine after the divorce is finalized, and as long as they engage in therapy, she had no concerns about their future academic performance or emotional health. The GAL indicated she had no concerns about Suzanna's mental health or ability to parent. Although the GAL did not recommend shared parenting, she testified that Michael genuinely loves his children, that Vivian is comfortable with Michael, and that he and Vivian have a good and very loving relationship.

{¶ 68} Michael testified he filed an emergency motion for change of custody of Vivian the day after the 2020 Father's Day in part because he believed she had a urinary tract infection. Michael admitted that upon finding Vivian did not have such infection, he nevertheless kept her. Michael testified he was the better suited parent to follow and enforce court orders; by contrast, Suzanna had not consistently followed the parenting time schedule. With the exception of the withholding incident, Michael testified he had always complied with court-ordered parenting time. Michael disputed much of the contents of the GAL's reports and asserted that two emergency motions filed by the GAL during the divorce proceedings interfered with his ability to work things out with Suzanna.[3] Michael opined that the GAL's emergency motions greatly harmed the family unit and his relationship with the children and further damaged the capacity for shared parenting: "this contentious divorce has destroyed the family. And I feel very strongly that the [GAL] contributed significantly to the destruction of my family with reducing parenting time and unfounded motions repeatedly." Michael stated he loves his children very much, misses his sons greatly, and lamented "the systemic alienation of [his] children."

{¶ 69} Suzanna testified about the strained relationship between Michael and their sons and how in particular, Michael's relationship with Ian greatly deteriorated following the withholding incident as Ian was afraid of going to Michael's home and being kept there. Following the withholding incident, Suzanna described how, upon seeing Michael's car on the parking lot of the physician's office, Vivian became upset, screaming hysterically and refusing to leave Suzanna's car. Once in the medical office, Vivian continued to cry and hid

---

3. The GAL filed the emergency motions in August 2019 and December 2019, respectively. Based upon Vivian's statements to the GAL, the first motion sought supervision of Michael's parenting time and a psychological evaluation of Michael. The parties' parenting time was modified, Michael underwent a psychological evaluation, and the GAL withdrew the motion. The second motion sought supervision of Michael's parenting time following a physical altercation between Michael and Ian that resulted in Ian and Vivian being physically injured. Following an in camera interview with Ian, the magistrate denied the motion.

behind a chair. Vivian eventually calmed down after she and Suzanna went into a room without Michael.

{¶ 70} Suzanna testified she does not trust Michael to cooperate to make joint decisions regarding the children, to encourage the sharing of love and affection between the parties and the children, to cooperate and communicate with her regarding the children, and to encourage and honor parenting time. Suzanna testified that although the parties can occasionally compromise on decisions, they do not see eye to eye regarding vaccinations as Michael generally distrusts doctors and "Big Pharma." Suzanna testified how following the closing of the children's schools due to COVID-19, Michael refused to change the pickup and exchange schedule, forcing her to change her work hours and miss a weekly meeting. The record indicates that Michael was unemployed during the divorce proceedings. Suzanna also testified that after Ruppert stopped visiting Michael in the spring of 2019, she could not and did not force him to see his father as it would have damaged her relationship with Ruppert. Suzanna explained that at the time, Michael would videotape every interaction between the parties and accuse her of "things" in front of the children and her church congregation. As a result, every interaction was stressful and traumatic for her and the children.

{¶ 71} In reaching its custody determination, the trial court noted: the parties' inability to get along; Michael's hostility toward Suzanna and his unbending attitude toward the children; Michael withholding custody of Vivian from Suzanna for six weeks in violation of a court order for which he was found in contempt; Vivian's emotional outburst in the physician's office which occurred shortly after Michael returned Vivian to Suzanna's care; the fact Vivian is troubled by the conflict between her parents; that Michael now lives in Brown County, that there was no assurance the children could continue to attend their school if Michael was designated residential parent, and that changing schools would be

harmful to the children; the GAL's concerns about Michael's mental health; and that Michael blames both Suzanna and the GAL for any difficulties he has with his parenting time, considering himself the aggrieved party.

{¶ 72} The evidence established that Vivian is loved by both parents and has a loving and close relationship with both.

{¶ 73} While testimony at the hearing revealed that Suzanna could have done more to enforce visitation between Michael and the parties' sons, there is no evidence Suzanna has willfully denied Michael his parenting time, including with the sons. By contrast, Michael willfully denied Suzanna parenting time with Vivian when he withheld Vivian from her mother for six weeks. Michael's action in turn negatively impacted his relationship with Vivian and temporarily caused unnecessary emotional issues for Vivian. Noticeably, Michael does not address how withholding Vivian from Suzanna for six weeks impacted Vivian.

{¶ 74} While the parties' testimony indicate some infrequent instances where they made joint decisions regarding the children's care and health during their marriage, the record plainly shows they are unable to cooperate and communicate with one another concerning the children's welfare during the divorce proceedings. Successful shared parenting requires a strong commitment to cooperate and a capacity to engage in the cooperation required. *Seng*, 2008-Ohio-6758 at ¶ 21. Plainly, these two elements are missing here.

{¶ 75} The fact that Michael clearly loves Vivian and wants to be with her does not change this decision. This is because, as noted above, the primary concern is Vivian's best interest, not whether Michael loves, cares for, and wants to be with Vivian. *See Hall v. Hall*, 12th Dist. Butler No. CA2018-05-091, 2019-Ohio-81, ¶ 26 (a father's "wishes about the care and control of his children * * * should not be placed above the children's best interests"). "To hold otherwise would render the best-interest factors set forth in R.C. 3109.04(F)(1)

- 24 -

and R.C. 3109.04(F)(2) meaningless to a domestic relations court when awarding parental rights and responsibilities under R.C. 3109.04." *Vaughn v. Vaughn*, 12th Dist. Warren No. CA2021-08-078, 2022-Ohio-1805, ¶ 45. "That is not what the law plainly states." *Id.*

{¶ 76} After carefully reviewing the record and considering the foregoing, we find that the trial court weighed all appropriate R.C. 3109.04(F) factors in reaching its custody decision. The trial court did not abuse its discretion in declining to adopt a shared parenting plan and in designating Suzanna as the residential parent and legal custodian of Vivian.

{¶ 77} Michael's second assignment of error is overruled.

{¶ 78} Judgment affirmed in part, reversed in part, and remanded.

HENDRICKSON and PIPER, JJ., concur.